**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Richard R. Day,<br>Petitioner<br>-vs-<br>Charles L. Ryan, et al.,<br>Respondents. | CV-13-0952-PHX-GMS (JFM)<br><br>**Report & Recommendation On Petition For Writ Of Habeas Corpus** |

# I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison Complex at Tucson, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on May 8, 2013 (Doc. 1).  On September 5, 2013 Respondents filed their Answer (Doc. 9). Petitioner filed a Reply on October 9, 2013 (Doc. 10), and has supplemented the record with various documents (Doc. 18).

The Petitioner's Petition is now ripe for consideration.  Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

# II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

## A. FACTUAL BACKGROUND

In disposing of Petitioner's direct appeal, the Arizona Court of Appeals summarized the factual background as follows:

> Appellant, who was forty-three at the time of the trial, had lived with his grandparents, Verlin S. and Lois S., since the age of eighteen. After Verlin's death on March 26, 2003, Rickey, Nancy P.

1

(Appellant's aunt), and Appellant discussed the welfare of Lois's health and the deteriorating condition of her house. Appellant became angry when Lois's children discussed the option of having Lois live in an assisted living facility. Appellant then visited a paralegal who prepared the following: Proposed changes in Lois's will, a joint tenancy deed, and a proposed document granting Appellant power of attorney to make her financial and personal decisions. Appellant presented these documents to Lois for her signature, and Lois signed them. Further, Appellant adamantly argued to keep Lois at her house in Phoenix; if she moved and the house sold, Appellant would have to find another place to live.

In April 2003, over Appellant's objections, Lois moved to Las Vegas to live with her daughter, Nancy. Nancy left a message with Appellant, informing him that Rickey would be coming over to Lois's house at her request to gather her clothes and other personal belongings. When Rickey and other family members arrived, he discovered Appellant had changed the door locks; however Rickey had a new key and was able to unlock the front door with that key. After entering the house, Rickey's wife noticed that a chair had been blocking the door and that the inside of the door knob had fallen off. While gathering Lois's belongings, no one entered Appellant's room or removed any of his property. Later, after Rickey and the others had left and after Appellant came home, Officer Tiffany Scott of the City of Phoenix Police Department responded to a robbery reported by Appellant. Despite Appellant stating that Rickey was responsible, Officer Scott did not consider him a suspect.

Two days later, on May 10, Rickey returned to Lois's house. Nancy had told him that Appellant was leaving for Las Vegas on May 9, with an apparent plan to return with Lois; however, unbeknownst to Rickey, Appellant had not yet left. Rickey entered the house through a window in the living room, where a muddy footprint was later found by Detective Clifton Jewell of the City of Phoenix Police Department. Appellant first engaged Rickey in the living room, where Detective Jewell later found a bullet hole in the wall, and the cartridge casing in the sofa. Appellant's girlfriend, who was also in the house at the time, heard noise of the conflict move from the hallway to the master bedroom. In the master bedroom, Appellant's girlfriend heard Rickey say, "No, don't, don't. Please don't kill me. I'm sorry." Appellant's girlfriend then heard a gunshot. Appellant called 911 and reported that he had shot his uncle.

Police officers found Rickey in the bathroom between the toilet and bathtub, with a linear abrasion on his left forearm and a gunshot wound to his left chest. The Chief Medical Examiner for Maricopa County testified that a bullet entered Rickey's thorax, and caused his death. Rickey also had a "shored" exit wound on the left portion of his back, indicating he was shot while against something firm, such as a mattress or wall.

(Exhibit D, Mem. Dec. 8/16/07 at 3-6.) (Exhibits to the Answer, Doc. #, are referenced herein as "Exhibit ___.")

//

//

2

**B. PROCEEDINGS AT TRIAL**

On June 3, 2003, Petitioner was indicted on charges of first degree murder, and following remand to the grand jury, was again indicted on September 5, 2003. (Exhibit D, Mem. Dec. at 2-3.)

Petitioner was found incompetent to stand trial, based upon delusional beliefs of a widespread conspiracy against him, but on subsequent re-evaluation, was found competent to stand trial. (*Id.* at 3.)

Petitioner proceeded to a jury trial, testified on his own behalf in support of his defense theory of self-defense, including testifying that he had overheard the victim saying "it would be 'nice' if [Petitioner] 'disappeared.'" (*Id.* at 8.) The Arizona Court of Appeals described Petitioner's description of events on the day of the shooting as follows:

> On the night of May 9, 2003, Appellant thought he heard someone on the roof. At 7:00 a.m. the next morning Appellant heard a loud noise but he went back to sleep. Appellant then heard a screen door open and got out of bed but again went back to bed. Moments later Appellant heard a window slide open and he then grabbed a gun. As Appellant moved into the living room from the hallway he encountered Rickey who told him not to shoot. Appellant instructed Rickey to lie on the ground. Appellant saw a knife in a sheath in Rickey's hand, turned his head, and fired one shot. After Appellant shot at Rickey, Rickey fell down three times and then, surprisingly, rammed him into a bookcase. Appellant and Rickey continued to struggle, but Appellant was able to control Rickey, until Rickey got away and hid behind a chair in the living room.
> Appellant further testified that he retreated to his bedroom while Rickey ran to hide in the master bedroom. Rickey frantically tried to open the arcadia door in the master bedroom; however a dowel rod prevented the door from opening. Appellant then pointed his gun at Rickey and ordered him to the floor. Rickey threw a pillow at Appellant in a failed effort to protect himself. Purportedly fearing for his life, Appellant shot Rickey. Rickey apparently got off the floor and went into the bathroom, leaving the knife on the floor, while Appellant went into a different room to call 911. As noted above, Rickey subsequently died as a result of his gunshot wounds.

(*Id.* at 8-9.)

Petitioner was found guilty of first degree murder, and considering Petitioner's mental health as a mitigating factor the trial court sentenced him to life in prison with the

3

possibility of parole after 25 years. (*Id.* at 10; Exhibit A, Sentence.)

## C. PROCEEDINGS ON DIRECT APPEAL

Petitioner filed a direct appeal. Counsel was unable to find an appealable issue, and filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967) and related state cases, asking the court to review the record for error and seeking leave for Petitioner to file a supplemental brief. (Exhibit B, Opening Brief.)

Petitioner then filed a Supplemental Opening Brief (Exhibit C), arguing that counsel was ineffective for failing to investigate, obtain or present various evidence.

In a decision issued August 16, 2007, the Arizona Court of Appeals declined to reach Petitioner's claims of ineffective assistance, finding that they should properly be brought in a petition for post-conviction relief. (Exhibit D, Mem. Dec. at 10.) The court searched the record for, and found no reversible error. (*Id.* at 11.)

Petitioner did not seek further review. (Exhibit E, Order and Mandate.)

## D. PROCEEDINGS ON POST-CONVICTION RELIEF

On November 20, 2007, more than 90 days after the conclusion of his direct appeal, Petitioner filed a motion to extend the time to file his petition for post-conviction relief (Exhibit F). The PCR court did not rule on this motion, and Petitioner has never filed anything further with the PCR court. (Exhibit G, Docket.)

## E. PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on May 8, 2013 (Doc. 1). The original petition was unsigned, and Petitioner submitted a separate certification of the Petition on February 18, 2014 (Doc. 25). Petitioner's Petition asserts the following two grounds for relief: (1) ineffective assistance of counsel; and (2) the prosecution withheld potentially exculpatory evidence.

**Response** - On September 5, 2103, Respondents filed their Answer (Doc. 9). Respondents argue that the Petition is barred by the habeas statute of limitations, and that Petitioner has procedurally defaulted on his state remedies.

**Reply** - On October 9, 2013, Petitioner filed a Reply (Doc. 10).  Petitioner argues that he was innocent, that appellate counsel was ineffective for failing to raise his claims, that he abandoned his PCR proceeding due to his depression, lack of work space, and lack of legal training and resources.  He argues he is entitled to equitable tolling because of his mental conditions.  He also argued that he has shown cause and prejudice to excuse his procedural defaults.

**Motions to Expand Record and Conduct Discovery** – Petitioner filed a series of motions seeking to expand the record to submit additional documents, and to conduct discovery to obtain additional documents.  The Court initially denied these requests without prejudice. (Order 10/31/13, Doc. 13; Order 12/3/13, Doc. 16.)  Petitioner raised the issues again through a Motion to Reconsider Production of Documents (Doc. 17) and Motion for Reconsideration to Submit Additional Exhibits (Doc. 18), filed December 19, 2013.  The former was denied based upon Petitioner's failure to proffer any basis for admission of the additional documents in light of the limited issues arising under the procedural defenses, and granted the latter to permit consideration of the additional documents submitted with Petitioner's motion (Doc. 18), Exhibits D-R through O-R.

### III. APPLICATION OF LAW TO FACTS

**A. TIMELINESS**

**1. One Year Limitations Period**

Respondents assert that Petitioner's Petition is untimely.  As part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress provided a 1-year statute of limitations for all applications for writs of habeas corpus filed pursuant to 28 U.S.C. § 2254, challenging convictions and sentences rendered by state courts.  28 U.S.C. § 2244(d).  Petitions filed beyond the one year limitations period are barred and

must be dismissed. *Id.*

### 2. Commencement of Limitations Period

**Conviction Final** - The one-year statute of limitations on habeas petitions generally begins to run on "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[1]

Here, Petitioner's direct appeal remained pending through August 16, 2007, when the Arizona Court of Appeals denied his direct appeal. (Exhibit D.) Thereafter, Petitioner had 30 days to seek review by the Arizona Supreme Court. Ariz. R. Crim. P. 31.19(a) He did not do so. Accordingly, his conviction became final on Monday, September 17, 2007, 30 days after the Arizona Court of Appeals denied his appeal. Therefore, Petitioner's one year began running on September 18, 2007, and without any tolling expired on September 17, 2008, making his May 8, 2013 Petition more than four years and seven months delinquent.

**New Rule** – Petitioner argues that his Petition should be considered timely because it is based on *Maples v. Thomas*, 132 S.Ct. 912 (2012). (Petition, Doc. 1 at 7.)

The habeas limitations statute provides a later commencement date of "the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2244(d)(1)(C).

However, *Maples* did not establish a new constitutional right, but simply acknowledged that for purposes of finding cause and prejudice to excuse a procedural default, a petitioner is not charged with the conduct of an attorney who abandons the representation without notice. While Petitioner might rely on *Maples* as a basis for cause

---

[1] Later commencement times can result from a state created impediment, newly recognized constitutional rights, and newly discovered factual predicates for claims. *See* 28 U.S.C. § 2244(d)(1)(B)-(D). Except as discussed hereinafter, Petitioner proffers no argument that any of these apply.

to excuse a procedural default, he does not assert a claim that is itself based on *Maples*.

Thus, Petitioner's claim in his Petition is not founded on a constitutional right within the purview of 28 U.S.C. § 2244(d)(1)(D), and the finality of his conviction remains the proper commencement date for his habeas limitations period.

### 3. Statutory Tolling

The AEDPA provides for tolling of the limitations period when a "properly filed application for State post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). This provision only applies to state proceedings, not to federal proceedings. *Duncan v. Walker*, 533 U.S. 167 (2001).

Here, the only state filings by Petitioner after the denial of his direct appeal were his motion for indigent status and his motion to extend the time to file a petition for post-conviction relief. (Exhibit F.) Such filings do not, however, constitute an application for post-conviction relief.

It is true that under Arizona law, a petition for post-conviction relief is "pending" as soon as the notice of post-conviction relief is filed. *Isley v. Arizona Department of Corrections*, 383 F.3d 1054, 1055-56 (9th Cir. 9/13/04) ("The language and structure of the Arizona postconviction rules demonstrate that the proceedings begin with the filing of the Notice.") *See also* Ariz. R. Crim. P. 32.4(a). But here, Petitioner did not file such a notice, rather only a motion to extend the time to do so.

Consequently, Petitioner is not entitled to any statutory tolling.

### 4. Equitable Tolling

"Equitable tolling of the one-year limitations period in 28 U.S.C. § 2244 is available in our circuit, but only when 'extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time' and 'the extraordinary circumstances were the cause of his untimeliness.'" *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir. 2003).

> To receive equitable tolling, [t]he petitioner must establish two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way. The petitioner must additionally show that the extraordinary circumstances were the cause of his untimeliness, and that the extraordinary circumstances ma[de] it impossible to file a petition on time.

*Ramirez v. Yates,* 571 F.3d 993, 997 (9th Cir. 2009) (internal citations and quotations omitted). "Indeed, 'the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule.' " *Miranda v. Castro,* 292 F.3d 1063, 1066 (9th Cir. 2002) (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.). Petitioner bears the burden of proof on the existence of cause for equitable tolling. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006) ("Our precedent permits equitable tolling of the one-year statute of limitations on habeas petitions, but the petitioner bears the burden of showing that equitable tolling is appropriate.").

**Discovery of *Maples* Decision** - Petitioner argues in his Petition that he was unaware of the decision in *Maples v. Thomas*, 132 S.Ct. 912 (2012). (Petition, Doc. 1 at 7.) As noted above, *Maples* does not justify a delayed commencement of the limitations period. Assuming *arguendo* that it's adoption could justify equitable tolling (e.g. because a petitioner had delayed filing, believing his claims were procedurally defaulted until *Maples* was decided), Petitioner fails to show diligence in acting on *Maples*. *Maples* was decided in January, 2012, and yet Petitioner contends he did not become aware of it until April, 2013, some 15 months later. Petitioner fails to show that his belated discovery of *Maples* was an extraordinary circumstance, as opposed to his only dilatoriness in pursing his rights. Moreover, Petitioner fails to proffer anything to suggest that he had previously withheld filing his habeas petition believing the claims were procedurally defaulted.

Perhaps most importantly, *Maples* would not, in any event, apply to Petitioner. Petitioner makes no suggestion that any counsel abandoned him without notice. At most, Petitioner contends that trial and appellate counsel were deficient in pursuing his

claims. Such garden variety negligence was rejected as a basis for cause and prejudice in *Maples*. "Negligence on the part of a prisoner's postconviction attorney does not qualify as "cause." *Maples*, 132 S.Ct. at 922. Rather, the attorneys in *Maples* had simply stopped working on the case, had obtained other employment, and left the petitioner believing he was been represented in the matter.

**Ineffective Assistance of Appellate Counsel** - In his Reply (Doc. 10), Petitioner argues that that appellate counsel was ineffective for failing to raise his claims, and that he abandoned his PCR proceeding due to his depression, lack of work space, and lack of legal training and resources. He argues he is entitled to equitable tolling because of his mental conditions.

Petitioner fails to explain how appellate counsel's failure to adequately assert his claims on direct appeal precluded him from filing his habeas petition on a timely basis. Such failure might constitute a defense to a failure to exhaust state remedies, but Petitioner fails to show how it is relevant to the filing of his federal habeas petition.[2] Moreover, "a 'garden variety claim' of attorney negligence" does not establish the kinds of extraordinary circumstances that can justify equitable tolling of the habeas limitations period. *Holland v. Florida*, 560 U.S. 631, 652 (2010).

**Mental Conditions** – Petitioner argues that he abandoned his state PCR proceeding because of depression and that he has "been mentally incapable of dealing with everything associated with my wrongful conviction." (Reply, Doc. 10 at 9.)

"Where a habeas petitioner's mental incompetence in fact caused him to fail to meet the AEDPA filing deadline, his delay was caused by an "extraordinary circumstance beyond [his] control," and the deadline should be equitably tolled." *Laws v. Lamarque*, 351 F.3d 919, 923 (9th Cir. 2003). "However….mental incompetence is not a *per se* reason to toll a statute of limitations. Rather, the alleged mental

---

[2] In his Exhibit P-R to his Motion for Reconsideration regarding supplementing the record (Doc. 18) Petitioner provides copies of correspondence with trial counsel concerning the actions he wanted counsel to undertake, his requests for records, etc. The latest such correspondence, however, was from July, 2005, long before his limitations period began to run.

incompetence must somehow have affected the petitioner's ability to file a timely habeas petition." *Nara v. Frank,* 264 F.3d 310, 320 (3rd Cir. 2001), *overruled in part on other grounds by Carey v. Saffold*, 536 U.S. 214 (2002). "[M]ental illness tolls a statute of limitations only if the illness in fact prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them. Any other conclusion would perpetuate the stereotype of the insane as raving maniacs or gibbering idiots." *Miller v. Runyon,* 77 F.3d 189, 191 -192 (7th Cir. 1996) (applying equitable tolling to Rehabilitation Act).

A habeas petitioner must allege more than the "mere existence of physical or mental ailments" to invoke the equitable tolling of the AEDPA's statute of limitations. *Rhodes v. Senkowski*, 82 F.Supp.2d 160, 173 (S.D.N.Y.2000). Instead, a habeas petitioner has the burden of showing that mental health problems rendered him or her unable to file a habeas petition during the one year limitations period. *Id.* It is not sufficient to show that filing was rendered difficult, but rather Petitioner must show that it was rendered impossible.

Petitioner proffers nothing besides vague descriptions of depression and despondency, emotional states not at all uncommon among those serving a life sentence. It is true that Petitioner had initially been found incompetent to stand trial. But that was based on delusions, not depression. The problem was sufficiently resolved for Petitioner to be found competent to proceed to trial. And, Petitioner proffers nothing to suggest that such condition had reoccurred.

Moreover, the ability to file petitions during the limitations period is evidence that Petitioner's mental illness did not prevent him from filing a habeas petition. *See Gaston v. Palmer*, 417 F.3d 1030, 1035 (9th Cir. 2005), *modified on other grounds*, 447 F.3d 1165 (9th Cir. 2006) ("Because [petitioner] was capable of preparing and filing state court petitions [during the limitations period], it appears that he was capable of preparing and filing a [federal] petition during the time in between those dates.").

Not only had Petitioner managed to file his Supplemental Opening Brief (Exhibit

C) in May, 2007, a year and a half after his conviction, and just three months before his one year began to run, but in November, 2007 (while his one year was running) he was able to file his Motion for Indigent Status and Motion for 60 Day Extension (Exhibit F). Each of these documents contained well reasoned, articulate arguments. Petitioner proffers nothing to show any variation in his mental capacity between that time and when he finally filed his habeas petition.

Nor does Petitioner proffer anything to show his diligence in the face of any incapacity. For example, Petitioner proffers nothing to show that the fog of his depression lifted only shortly before he filed the instant Petition, and had not lifted at any time earlier. Ordinarily, thirty days after elimination of a roadblock should be sufficient for a diligent petitioner to file his habeas petition. *See Guillory v. Roe*, 329 F.3d 1015, 1018, n.1 (9th Cir. 2003).

***Pro Se* Status** – Petitioner complains that he is untrained in the law. A prisoner's *pro se* status is not an extraordinary circumstance. *Felder v. Johnson*, 204 F.3d 168 (5th Cir. 2000). And, "ignorance of the law, even for an incarcerated *pro se* petitioner, generally does not excuse prompt filing." *Fisher v. Johnson*, 174 F.3d 710, 714 (5th Cir.1999). Moreover, Petitioner proffers no evidence of any diligent efforts despite such limitations to timely file.

**Lack of Legal Resources** – Petitioner complains that he lacked adequate space and legal resources to pursue his petition.

This circuit has found that a lack of access to legal resources may be an extraordinary circumstance warranting equitable tolling. *See, e.g., Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc) (finding that unavailability of a copy of the AEDPA in a prison law library could be grounds for equitable tolling). However, in cases where courts have found that an extraordinary circumstance might exist, the petitioner always pointed to specific materials to which he did not have access. *See, e.g., Roy v. Lampert*, 465 F.3d 964, 974 (9th Cir. 2006) (finding that lack of access to AEDPA materials and Oregon law books may be an extraordinary circumstance);

*Mendoza v. Carey*, 449 F.3d 1065 (9th Cir. 2006) (finding that lack of access to Spanish language legal materials or assistance could entitle habeas petitioner to equitable tolling).

Here, Petitioner points to no specific deficiencies, nor does he explain how they precluded him from filing on time. Petitioner's ineffective assistance claims had already been largely spelled out by him in his supplemental opening brief on direct appeal. He does not suggest that additional legal resources were needed to present them, or his prosecutorial misconduct claims, to this Court. Petitioner's habeas petition does not turn on novel points of law, and indeed contains almost no legal references.

Nor does Petitioner explain how limitations on the space available to him precluded a timely filing. The undersigned is aware the Arizona Department of Corrections routinely limits prisoners to the volume of materials they can maintain in their cell at a given time. But they also permit prisoner's to rotate their materials in and out of storage, and despite these limitations other prisoners routinely file timely state and federal briefs and petitions. *See* Arizona Department of Corrections Departmental Order 902.10 (Legal Property), available at *http://www.azcorrections.gov/Policies/900/0902.pdf*, last accessed 2/20/14.

**Summary re Equitable Tolling** – Petitioner fails to meet his burden of showing that extraordinary circumstances beyond his control made it impossible to file a petition on time, and has failed to show that he acted diligently in the face of whatever limitations he faced.

## 5. Actual Innocence

To avoid a miscarriage of justice, the habeas statute of limitations in 28 U.S.C. § 2244(d)(1) does not preclude "a court from entertaining an untimely first federal habeas petition raising a convincing claim of actual innocence." *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1935 (2013). To invoke this exception to the statute of limitations, a petitioner "'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Id.* at 1935 (quoting *Schlup v. Delo*,

513 U.S. 298, 327 (1995)). This exception, referred to as the "*Schlup* gateway," applies "only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.' " *Id.* at 1936 (quoting *Schlup,* 513 U.S. at 316).

> *Schlup* requires a petitioner "to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." The habeas court then "consider[s] all the evidence, old and new, incriminating and exculpatory," admissible at trial or not. On this complete record, the court makes a " 'probabilistic determination about what reasonable, properly instructed jurors would do.' "

*Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011).

The Respondents have not provided the complete record at trial. However, the Arizona Court of Appeals summarized the evidence from trial, including Petitioner's defense. Petitioner does not suggest any deficiency in those summaries, but merely contends they represent "the states one sided and inacurate (sic) view." (Reply on Mot., Doc, 22 at 5.) Given the nature of the new evidence suggested by Petitioner, the undersigned finds that a review of the transcripts themselves is unnecessary to disposing of Petitioner's assertions of actual innocence.

Petitioner's briefs do not explicitly assert his actual innocence as a basis to avoid the statute of limitations bar. (*See* Petition Doc. 1 at 7; Reply, Doc. 10, generally.) Petitioner does continue to argue that he shot his uncle in self-defense (albeit after admittedly following his uncle from room-to-room, while he was armed with only a sheathed knife, and ultimately shooting him while he was seated. (*See* Reply, Doc. 10 at 5-7.) However, Petitioner proffers no new reliable evidence in support of his self-defense claim.[3]

In his Motion for Reconsideration regarding Submitting Additional Exhibits

---

[3] In his Motion for Reconsideration regarding Production of Documents (Doc. 17) Petitioner sought the production of various documents which he contended were "paramount in proving [his] innocence." (*Id.* at 2.) However, Petitioner offered no explanation how the requested information would show his actual innocence, but merely speculated that it would do so. Consequently, the motion was denied.

13

1 (Doc. 18), Petitioner supplemented the record with a variety of documents which
2 Petitioner conceded "doesn't prove innocence; however it shows intent to deceive by all
3 parties, jelousy [sic] and hatred by Ricky/deceased," etc. (Doc. 18 at 4.)

4 However, the bad blood between the family members was already plainly before
5 the trial jury. (*See* Exhibit D, Mem.Dec. at 4-5, 7-8.) Indeed, the vast majority of
6 information now proffered by Petitioner revolves around his attempts to paint his
7 relatives as the malfeasors in their relationships. In particular, Petitioner provides a
8 transcript of an interview of Petitioner's uncle, Richard Perlotto, Sr. (Motion, Doc. 18
9 Ex. D-R), which solely relates to the family dealings. Similarly, his Exhibit E-R is a
10 narrative and a transcript of an interview of Petitioner's cousin, Carla Perlotto relating
11 various reasons for a poor relationship between Petitioner and the victim, as well as
12 family dealings. Petitioner's Exhibit F-R is a transcript of an interview with Petitioner's
13 aunt, Nancy Perlotto, again addressing family dealings. His Exhibit G-R is a transcript
14 of an interview with Petitioner's grandmother, Lois Stephens, on family dealings.
15 Exhibit H-R is a copy of the report from Adult Protective Services concerning their
16 investigation of the complaints of abuse against Petitioner. Exhibit I-R.is the police
17 report on the Petitioner's against the victim for breaking into the home. Exhibit K-R is a
18 transcript from the grand jury including testimony about the burglary report and the
19 dispute over the care of Petitioner's grandmother. Exhibit L-R is a grand jury transcript
20 with testimony concerning Petitioner's financial condition and dealings with his
21 grandmother, the victim's access to the home and the purported burglary. Exhibit N-R is
22 two transcripts of conversations between Petitioner and his grandmother concerning her
23 leaving the home to go to his aunt's house, and the family dealings. Exhibit O-R is
24 several emails and letters from the victim accusing Petitioner of various misdeeds and
25 regarding the family dealings.

26 A reasonable juror could be fully convinced that Petitioner's relatives were
27 completely in the wrong in their dealings with Petitioner, and yet still have convicted
28 Petitioner of first degree murder. The evidence at trial, even Petitioner's own version of

the facts as presented in his testimony at trial, were consistent with the prosecution's theory that rather than acting in self-defense, Petitioner repeatedly shot his uncle as the uncle retreated through the house and tried to escape. The jury was already presented with evidence that the uncle had broken into the home. Additional information that the uncle or other family members were behaving badly toward Petitioner or his grandmother prior to the time of the shooting would not cause the undersigned to view the events at the time of the shooting differently so as to lose confidence in the outcome of the trial. Indeed, to the contrary, such evidence could be viewed as lending credence to the prosecution's theory that Petitioner did not act in self-defense, but out of animosity toward his uncle.

Petitioner suggests that his newly proffered evidence indicates conflicts with the testimony or other statements by witnesses, and thus reduces their credibility. However, most of these purported inconsistencies similarly focus on events prior to the shooting such as the various relationships and dealings among the family, and would not alter the jury's view of the critical events at the time of the shooting.

Petitioner's Exhibit J-R is the transcript of an interview of Officer Knowles who was involved in the homicide investigation, which Petitioner purports shows that the gun had been moved at the scene and had unknown DNA on it and no prints from Petitioner or the victim. Conversely, Exhibit K-R is a transcript from the grand jury including testimony that nothing at the scene had been touched before photographs were taken. However, Petitioner fails to suggest how any of that shows actual innocence. At best, he argues that his information reveals "[d]eliberate concealing, altering and destroying evidence, perjuries, threatening witness…are a reflection of how weak the states case [was]. Sloppy forensics, cataloging evidence problems, perjured testimony by police, forensics." (Motion, Doc. 18 at 3.) Here, however, there was no dispute that Petitioner had shot the victim, or about the weapon he had used. Mishandling of the gun might have been unprofessional, but it does not establish Petitioner's actual innocence.

Exhibit L-R is a grand jury transcript with testimony concerning the pillow in the

master bedroom with the bullet hole through it. Exhibit M-R is a transcript of an interview of the criminalist concerning the gunshot through the pillow. In his Reply, Petitioner argues that given the angle of trajectory through the pillow, he would have had to have been standing on a ladder at the time he shot through the pillow. (Doc. 10 at 6.) Petitioner's logic is unclear. He testified at trial that the victim "threw a pillow at Appellant" resulting in Petitioner again shooting. (Exhibit D, Mem. Dec. at 9.) He does not argue that he did not shoot the pillow. It is unclear how Petitioner would purport to calculate the angle of a shot going through a pillow being thrown, which could have been intercepted by the bullet at any number of angles of rotation. More importantly, Petitioner does not suggest how, in light of his own testimony, the precise angle of the shot would establish his actual innocence.

In sum, Petitioner, at best, asserts various perceived weaknesses in the prosecution's evidence. A finding of "actual innocence" is not to be based upon a finding that insufficient evidence to support the charge was presented at trial, but rather upon affirmative evidence of innocence. *See U.S. v. Ratigan*, 351 F.3d 957 (9th Cir. 2003) (lack of proof of FDIC insurance in a federal bank robbery case, without evidence that insurance did not exist, not sufficient to establish actual innocence). Moreover, an actual innocence analysis does not invite a simple reconsideration of the evidence at trial, but requires consideration of new evidence. "To meet this standard, [the Petitioner] must first furnish 'new reliable evidence ... that was not presented at trial.' " *Griffin v. Johnson,* 350 F.3d 956, 961 (9th Cir. 2003) (quoting *Schlup*, 513 U.S. at 324).

Petitioner fails to meet his burden of providing this Court with new "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Lee*, 653 F.3d at 938, showing his actual innocence.

### 6.  Summary re Statute of Limitations

Petitioner's one year habeas limitations period commenced running on September 18, 2007, and expired on September 17, 2008, making his May 8, 2103 Petition more

16

than four years and seven months delinquent. Petitioner has shown no basis for statutory tolling, and no basis for equitable tolling or actual innocence to avoid the effects of his delay. Consequently, the Petition must be dismissed with prejudice.

### B. OTHER DEFENSES

Respondents also argue that Petitioner's state remedies were not properly exhausted and are procedurally defaulted. Because the undersigned finds the Petition plainly barred by the habeas limitations period, the undersigned does not reach this defense.

## IV. CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment. The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner. Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition

on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be on procedural grounds.  To the extent that Petitioner's claims are rejected on procedural grounds, under the reasoning set forth herein,  the undersigned finds that "jurists of reason" would not "find it debatable whether the district court was correct in its procedural ruling."  Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.

## V.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of Habeas Corpus, filed May 8, 2013 (Doc. 1) be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that, to the extent the reasoning of this Report and Recommendation is accepted, a Certificate of Appealability be **DENIED**.

## VI. EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See also* Rule 8(b), Rules Governing Section 2254 Proceedings. Thereafter, the parties have fourteen (14) days within which to file a response to the objections.  Failure to timely file objections to any

findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues, *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*), and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: February 21, 2014

13-0952r RR 14 02 06 on HC.docx

_____
James F. Metcalf
United States Magistrate Judge